IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JACOB ROBERTS,<br><br>                Plaintiff,<br><br>vs.<br><br>CENTRAL REFRIGERATED SERVICE, et al.,<br><br>                Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:13-cv-911<br><br>Judge Clark Waddoups |

## INTRODUCTION

Defendants Central Refrigerated Service, Inc. ("Central"), Jon Isaacson and Bob Baer move to compel arbitration of Plaintiff Jacob Roberts' individual claim and to dismiss the Complaint (Dkt. No. 2). In the alternative, Defendants request that the court stay further proceedings in the action pending the conclusion of arbitration. Defendants' Motion to Compel Arbitration asserts that the parties' written employment agreement mandates that the present dispute be arbitrated under the laws of Utah. Def.'s Mot. to Compel at 1 (Dkt. No. 15).

The court heard argument on February 13, 2014 and took the motion under advisement. After carefully reviewing the parties' filings and relevant legal authorities, the court GRANTS Defendant Central's Motion to Compel Arbitration and DISMISSES the case without prejudice.

## FACTUAL BACKGROUND

Central is a Utah-based refrigerated trucking company that is incorporated under the laws

of Nebraska and headquartered in Salt Lake City, Utah. Plaintiff Jacob Roberts was employed by Central as a company truck driver. Mr. Roberts filed a Complaint on October 8, 2013 alleging that Central failed to fully compensate him for wages earned while under their employ. Mr. Roberts also alleges "unlawful pay practices and policies" in violation of the Fair Labor Standards Act ("FLSA") and that Central failed to pay at least the minimum wage for orientation time, travel time, and training time.

Defendants assert that Mr. Roberts signed an agreement containing a mandatory binding arbitration clause that encompasses all claims related to Mr. Roberts' employment with Central. The agreement specifies that it be governed by Utah law. At or near the beginning of his employment with Central, Mr. Roberts was provided several documents to read and sign. One of the documents Mr. Roberts signed is the "Memorandum of Understanding Form" (the "Memorandum") which sets forth certain terms of the driver's employment with Central.

Directly above Mr. Roberts' signature is the following provision:

*I agree to and will be bound by the laws of Utah in all respects relating to the employee-employer relationship. I understand that I am a Utah employee for all employment issues*, which may include, but are not limited to wages, unemployment insurance, workers compensation, Title VII, ADA, ADEA, FMLA, Title 29 and so forth. I understand that I must report all work-related injuries to the Worker's Compensation department within 24 hours of occurrence. I have been issued a written policy with the proper procedure for the reporting of an injury. *Since I am now a Utah employee, I expressly agree to have all employment matters settled under the laws and jurisdiction of Utah*.

*I agree in the event of any dispute, claim or controversy arising between me or the company relating to my employment relationship*, any claim of discrimination, wrongful termination, sexual harassment, Title VII, ADA, ADEA, or FMLA, *that any such dispute or controversy will be settled by final, mandatory binding arbitration* in accordance with the arbitration rules of the American Arbitration Association and *any judgment upon the award rendered by the arbitrator may be entered into the court system of the State of Utah*.

*See* Def.'s Mot. to Compel, Ex. B (Dkt. No. 15-2) (emphasis added).

## ANALYSIS

### I. APPLICABLE LAW

#### A. Utah Contract Law

Under Utah law, generally, formation of a contract requires only an offer, an acceptance, and consideration. *Cea v. Hoffman*, 2012 UT App 101, P24 (Utah Ct. App. 2012). Where only the appearance of a promise exists, i.e., a statement made in such vague or conditional terms that the person making it commits himself to do nothing, the alleged promise is illusory and unenforceable. *Resource Management Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1036 (Utah 1985). Where one party reserves an absolute and unconditional power to terminate a contract, the contract is illusory and unenforceable. *Id.* at 1037.

#### B. Utah Arbitration Law

Under the Utah Arbitration Act, a written agreement to arbitrate an existing or future controversy arising between the parties to an agreement is "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." Utah Code Ann. §78B-11-107(1). The court decides whether an agreement to arbitrate exists or whether a controversy is covered by the agreement. *Id.* at §78B-11-107(2). An arbitrator decides whether "a condition precedent to arbitrability has been fulfilled" and whether "a contract containing a valid agreement to arbitrate is enforceable." *Id.* at §78B-11-107(3).

Thus, Utah law prescribes that the arbitration agreement is severable from the contract as a whole and the court need only determine whether the arbitration provision is enforceable. If the court determines that it is enforceable, all other issues must then be turned over to the arbitrator.

*See id.*; *cf. Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70-72 (2010) (under federal arbitration law an arbitration provision is severable from the remainder of the contract and any challenge to the contract as a whole is to be left for the arbitrator). Upon a showing of an agreement between the parties to a dispute to arbitrate, the court shall proceed summarily to decide the issue and order the parties to arbitrate. *Id.* at §78B-11-108(1)(b). If the court finds that there is no enforceable agreement, it may not order the parties to arbitrate. *Id.* at §78B-11-108(3).

Whether the arbitration agreement here constitutes a valid and enforceable agreement is a question of law. *Reed v. Davis County Sch. Dist.*, 892 P.2d 1063, 1064 (Utah App. 1995). In interpreting the arbitration agreement, the court looks first to the document itself. *Id.* When a written contract's language is not ambiguous, the parties' intent "must be determined from the words of the agreement." *Id.* at 1065. The policy of the law in Utah is to "interpret contracts in favor of arbitration, in keeping with our policy of encouraging extrajudicial resolution of disputes when the parties have not agreed to litigate." *Id.* (internal quotation marks and citations omitted).

> Arbitration is a contractual remedy for the settlement of disputes. The parties are free to structure their agreement in any manner they desire. We respect the parties' freedom to contract by enforcing arbitration agreements according to their terms and ensuring that arbitration proceedings are conducted in the manner to which the parties have agreed. As with any contract, we determine what the parties have agreed upon by looking first to the plain language within the four corners of the document.
>
> When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless. If we find the language unambiguous, we interpret the contract as a matter of law. We find ambiguity only where the language of the contract is reasonably capable of being understood in more than one sense.

*Peterson & Simpson v. IHC Health Servs.*, 2009 UT 54, *13 (internal quotation marks and citations omitted). "Incorporation by reference requires that 'the reference be clear and

unequivocal, and alert the non-drafting party that terms from another document are being incorporated.'" *Id.* at *15 (quoting *Hous. Auth. v. Snyder*, 2002 UT 28, *19).

## II. DISCUSSION

### A. <u>The FAA Does Not Preempt Either Application of the Utah Arbitration Act or Enforcement of the Arbitration Agreement</u>

#### i. <u>Federal Arbitration Act § 1 Exemption</u>

The FAA provides that it does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate commerce." 9 U.S.C. § 1. This is an express exemption from the general policy favoring arbitration under the FAA. *See Owner-Operator* at 1257 (10th Cir. 2004). "The Supreme Court has clarified that this . . . exemption applies only to workers actually engaged in the movement of goods in interstate commerce, in other words, to contracts of employment for transportation workers." *Id.* (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)).

#### ii. <u>Preemption Law: FAA vs. Utah Law</u>

"While the FAA preempts application of state laws which render arbitration agreements unenforceable, it does not follow, however, that the federal law has preclusive effect in a case where the parties have chosen in their arbitration agreement to abide by state rules." *Volt Information Sciences v. Board of Trustees of Leland Stanford University*, 489 U.S. 468, 472 (1989). There is not a federal policy favoring arbitration under a certain set of procedural rules. *Id.* at 476. The federal policy simply ensures the enforceability, according to their terms, of private agreements to arbitrate. *Id*. Interpreting a choice-of-law clause to make state rules governing arbitration applicable does not offend the rule of liberal construction nor does it offend

5

any other FAA policy. *Id.*

> In recognition of Congress' principal purpose of ensuring that private arbitration agreements are enforced according to their terms, [the United States Supreme Court has] held that the FAA preempts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.
>
> Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted."

*Id.* at 478-79. The effect of § 1 of the FAA is to leave the arbitration of disputes in the excluded categories as if the FAA had never been enacted. *Mason-Dixon Lines, Inc. v. International Brotherhood of Teamsters, etc.*, 443 F.2d 807, 809 (3d Cir. 1971). "There is no language in the FAA that explicitly preempts the enforcement of state arbitration statutes." *Palcko v. Airborne Express, Inc.,* 372 F.3d 588, 595 (3d Cir. 2004).

### iii. <u>Application</u>

Mr. Roberts argues that the court should decline to enforce the arbitration agreement because § 1 of the FAA excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Mr. Roberts asserts that as a transportation worker, he falls within the FAA exclusion and applying the Utah Act to him would interfere with the policy goals of Congress. He argues that the FAA preempts the application of Utah law.

Mr. Roberts points the court to *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001). In that case, the Court discusses the background for the enactment of § 1's exclusion of

transportation workers and explains that Congress had already enacted specific dispute resolution methods for seamen and their employers as well as railroad employees. *See* 532 U.S. at 121. Congress acted so that it would not unsettle established or developing statutory dispute resolution procedures covering specific types of workers. *See id.* Mr. Roberts argues that the *Circuit City* Court found "it was rational to conclude that Congress expanded the exemption to cover other interstate transportation workers so as to reserve for itself more specific legislation for those engaged in transportation." Pl.'s Mem. in Opp. at 11 (Dkt. No. 24).

While it is true that Congress has reserved for itself the power to enact more specific legislation for certain types of workers engaged in interstate transportation, Mr. Roberts fails to cite the court to any particular legislation specifically providing alternative dispute resolution means that would apply to him. In an attempt to show specific legislation that would apply, Mr. Roberts asserts that the FLSA provides this type of mechanism. Mr. Roberts fails, however, to point the court to any FLSA provision that might provide such means. The FLSA prescribes standards for the basic minimum wage and overtime pay and affects most private and public employment. It does not, however, provide any alternative dispute resolution means specifically for transportation workers engaged in interstate commerce like Mr. Roberts.

Mr. Roberts also refers the court to *Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*, 325 F. Supp. 2d 1252 (D. Utah 2004). While there are similarities between that case and the present one, *C.R. England* is not on point. In that case, Defendant C.R. England did not show that the arbitration clause at issue covered Plaintiffs' claims. *See* 325 F. Supp. 2d at 1259. Here, the arbitration agreement covers Mr. Roberts' claims. The arbitration clause at issue in *C.R. England* did not inform the employee that the state's arbitration action would be applied

if the FAA was found to be inapplicable. Here, conversely, Central's arbitration agreement makes it clear that Utah's state arbitration laws will apply.

The agreement states that "*I agree to and will be bound by the laws of Utah in all respects relating to the employee-employer relationship*" and "*I understand that I am a Utah employee for all employment issues.*" Furthermore, it states that "*[s]ince I am now a Utah employee, I expressly agree to have all employment matters settled under the laws and jurisdiction of Utah.*" The agreement further declares that "*I agree in the event of any dispute, claim or controversy arising between me and [Central] relating to my employment relationship . . . that any such dispute or controversy will be settled by final, mandatory binding arbitration.*" These are clear statements that Utah law controls the arbitration agreement. The court cannot read this language to mean anything other than that the employee will be subject to the state's arbitration law in the case of a dispute between employer and employee.

Because Mr. Roberts' claims against Central are matters involving his employment relationship with Central, Mr. Roberts' arbitration agreement with Central covers his claims. For example, Mr. Roberts alleges that Central failed to fully compensate him for wages earned while under their employ, that Central violated the FLSA by using unlawful pay practices and policies, and that Central failed to pay at least the minimum wage for orientation time, travel time, and training time. Each of these claims involves Mr. Roberts' employment relationship with Central. In his agreement, Mr. Roberts agreed to be bound by the laws of Utah in all matters involving his employee-employer relationship with Central. He also acknowledged that he would be a Utah employee for all employment issues once he signed the agreement. Moreover, he expressly agreed to have all employment matters settled under the laws and jurisdiction of Utah and to

have any dispute with Central settled by final and mandatory binding arbitration. Mr. Roberts' arbitration agreement covers all of his claims against Central.

The conclusion that the FAA does not preempt Utah law allowing for arbitration is confirmed by *Volt Information Sciences v. Board of Trustees of Leland Stanford University*, 489 U.S. 468 (1989). In *Volt*, the Supreme Court held that a California statute allowing a stay of arbitration was not preempted by the FAA where the parties had contracted that the arbitration agreement would be governed by California law. 489 U.S. at 470. The parties had entered into a construction contract under which Volt would install a system of electrical conduits on Stanford's campus. *Id.* The contract included an agreement to arbitrate all disputes between the parties relating to the contract. *Id.*

The contract also included a choice-of-law provision that provided that the contract be governed by the law of the place where the project is located, which was in California. *Id.* A dispute involving compensation for extra work arose between the parties during the course of the project and Volt made a formal demand for arbitration. *Id.* Stanford then filed an action against Volt in the California Superior Court alleging fraud and indemnity. In response, Volt petitioned the court to compel arbitration. *Id.* at 471. Stanford moved to stay arbitration pursuant to California law. *Id.*

The Superior Court denied Volt's motion to compel arbitration and the California Court of Appeal affirmed. *Id.* The Court of Appeal held that "by specifying that their contract would be governed by 'the law of the place where the project is located,' the parties had incorporated the California rules of arbitration . . . into their arbitration agreement." *Id.* at 472. The United States Supreme Court affirmed, ruling that "[w]here, as here, the parties have chosen in their agreement

to abide by the state rules of arbitration, application of the FAA to prevent enforcement of those rules would actually be inimical to the policies underlying state and federal arbitration law." *Id.* (internal citations and quotation marks omitted).

Similarly, here, Mr. Roberts and Central chose in their agreement to abide by Utah's arbitration law. Thus, allowing application of the FAA's § 1 exemption to prevent enforcement of the very state laws that the parties contracted for would indeed offend the policies underlying state and federal arbitration law. The FAA was designed to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Volt*, 489 U.S. at 474 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219 (1985)), "and place such agreements upon the same footing as other contracts." *Id.* (quoting *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 511 (1974) (internal citations and quotations marks omitted). Moreover, there is not a federal policy favoring arbitration under a certain set of procedural rules. *Id.* at 476. The federal policy is simply to ensure the enforceability of private arbitration agreements according to their terms. *Id.*

The parties are free to negotiate the terms of arbitration and the arbitration agreement here states that the laws of Utah will apply to any dispute that arises or is related to Mr. Roberts' employment with Central. Mr. Roberts in effect asks the court to declare that the FAA forbids application of the very laws that the parties contracted to govern their agreement. *Volt* does not support such a result. The "FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Id.* at 477.

As *Volt* states, the FAA's passage was motivated by a congressional desire to enforce agreements into which parties had entered. *Id.* at 478. Thus, the Supreme Court has recognized that the FAA does not require parties to arbitrate when they have not agreed to do so. *Id.*

Furthermore, it does not prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement or from electing that the agreement be governed by state rather than federal law. *See id.* "It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Id.*

Congress has not shown a clear intention to fill the entire field of arbitration here. Thus, the FAA's § 1 exemption does not preempt either application of the Utah Arbitration Act or enforcement of the arbitration agreement between Central and Mr. Roberts. Because Mr. Roberts and Central agreed for Utah law to govern their arbitration agreement, the court will not prevent them from abiding by the terms of their agreement. Utah law controls the enforcement of the arbitration agreement, which the court is required to enforce, and the Utah Act should be applied to its enforcement.

### B. The Arbitration Agreement is Not Included as a Part of Central's Drivers Manual and is Not Illusory.

Mr. Roberts also contends that the arbitration agreement is unenforceable. He argues that Central's Drivers Manual reserves for Central the complete and unfettered right to modify, revoke, or suspend any of its provisions. He continues that the Memorandum is a part of the Manual, thus allowing Central to modify or revoke it at any time. Such a revocable agreement, he argues, is illusory and unenforceable. Mr. Roberts' argument is based on the following provision found in Central's Manual:

> The information in this manual is subject to change without notice. [Central] reserves the rights to amend, revoke, replace or suspend any and all of the policies and procedures contained in *this* manual.

Pl.'s Mem. in Opp., Ex. B, 12 (Dkt. No. 24-2) (emphasis added).

Mr. Roberts' specifically argues that the Memorandum refers to the Manual as "*this* Drivers Manual" three times, not just as *the* Drivers Manual, but as "*this* Drivers Manual" (emphasis added). This language, he asserts, is sufficiently clear to find that the Manual incorporates the Memorandum, including the right of Central to modify or disavow the arbitration clause at will. Mr. Roberts also argues that the end of the Manual's table of contents lists Orientation Forms and suggests that the Memorandum was a part of these Orientation Forms. Additionally, Mr. Roberts asserts that if the Manual can be changed at any time to alter policies and procedures, then the arbitration clause is illusory because Central can change the arbitration agreement at any time. Central responds that the Memorandum does not incorporate the Manual and is a separate and distinct document.

The court finds that there is not a factual basis for Mr. Roberts' argument. The fact that the Memorandum refers to the Manual as "*this* Drivers Manual" three times is not a compelling basis to support the assertion that the Memorandum incorporates the Manual. The factual evidence does not support Mr. Roberts' assertion that the Orientation Forms referred to at the end of the Manual's table of contents makes the Memorandum a part of the Manual. Mr. Roberts argues that there is an ambiguity in the arbitration provision about whether it is part of the Manual. The court, however, finds no ambiguity. No language in the arbitration provision is unclear or suggests in any way that it is intended to be part of the Manual.

Furthermore, the language of the Manual is not sufficiently specific to incorporate the arbitration agreement into the Manual. Under Utah law, "[incorporation] by reference requires that 'the reference be clear and unequivocal, and alert the non-drafting party that terms from another document are being incorporated." *IHC Health Servs.* 2009 UT 54 at *15 (quoting

12

*Snyder*, 2002 UT 28 at *19) (internal quotation marks omitted). If Central intended to incorporate the Memorandum into the Manual or the Manual into the Memorandum, it did not do so clearly and unequivocally here to properly alert Mr. Roberts that the terms from the other document were being incorporated.

When interpreting the language of the arbitration agreement, the court looks for a reading that harmonizes the provisions in favor of arbitration and avoids rendering any provision meaningless. Here, the arbitration provision would, in essence, become meaningless, if it were read as being a part of the Manual and the Manual is later determined to be illusory. Based on the plain language contained within the four corners of the Memorandum and the arbitration agreement, the court finds that the agreement is not a part of the Manual.

Mr. Roberts points to *Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002), and *DeHart v. Stevens-Henager College, Inc.*, 2005 U.S. Dist. LEXIS 40199 (D. Utah Dec. 2, 2005), for support. The two cases are distinguishable. Both *Dumais* and *DeHart* involved arbitration agreements that were quite conspicuously a part of the employee handbooks. Unlike the arbitration agreement in *Dumais*, the Central arbitration provision does not allow Central the unfettered right to alter the provision's existence or scope because the agreement is not a part of the Manual. Moreover, there are no conflicts of provisions in this case like there were in *Dumais*.

In *DeHart*, the arbitration provision was included in two separate documents both of which were provided to the employee as part of a packet during new hire training. The first document was the employee manual that contained policies and procedures and the second document was a separate sheet containing the agreement which the employee signed. The arbitration provision was included in both. The striking difference between *DeHart* and this case

13

is that the arbitration agreement is not contained in both Central's Manual and in the separate Memorandum.

Furthermore, the arbitration agreement, standing on its own, is a valid contract consisting of an offer, an acceptance and consideration. Central offered Mr. Roberts employment in exchange for his agreement to certain terms of employment. The arbitration agreement is included among those terms and constitutes an offer. The consideration that accompanied the offer was Mr. Roberts' employment with Central. Mr. Roberts accepted Central's offer when he signed the agreement. Having entered into the contract with Central, Mr. Roberts accepted the benefit of the bargain and cannot now excuse himself and escape the requirements of the contract.

The court does not find Mr. Roberts' arguments to be compelling on this issue and holds that the Memorandum, and in turn, the arbitration agreement, are not a part of Central's Manual and the court finds that the agreement is not illusory. Because the court finds that the arbitration agreement is valid and enforceable, and separate from the Manual, any other issues concerning the validity and possible illusory nature of the Manual must be decided by the appointed arbitrator. *See* Utah Code Ann. §78B-11-107(2)-(3).

### C. The CEO Did Not Need to Sign the Arbitration Agreement Because It Was Part of an At-Will Employment Contract.

Mr. Roberts' argument that the arbitration agreement is unenforceable because it is not contained in an agreement signed by the CEO also fails. The Manual provides, under the section entitled "Employment At-Will," that:

> No [Central] manager, supervisor, or Driver has the authority to enter into any employment agreement for any specified period of time or to make any other employment agreement other than at-will. Only the CEO has the authority to make

any employment agreement, and then only in writing.

Pl.'s Mem. in Opp., Ex. B at 12 (Dkt. No. 24-2). Mr. Roberts argues that this provision encompasses the arbitration agreement and that because Central's CEO never signed Mr. Roberts' arbitration agreement, no contract to arbitrate was ever formed.

Mr. Roberts, however, misunderstands the language and meaning of this provision. The provision's plain language is clear and unambiguous. It simply states that it pertains only to employment agreements that are "other than at-will." Because Mr. Roberts' employment agreement with Central is an at-will agreement, it falls under the exception to this provision of the Manual. The provision simply does not apply to Mr. Roberts' arbitration agreement and the agreement did not need to be signed by Central's CEO.

## **CONCLUSION**

The court GRANTS Defendant Central Refrigerated Service's Motion to Compel Arbitration (Dkt. No. 15) and DISMISSES Plaintiffs' Complaint (Dkt. No. 2) without prejudice. The arbitration agreement is valid and enforceable and is severable from the contract as a whole. The court orders that the case be submitted to arbitration according to the terms of the agreement.

SO ORDERED this 18th day of June, 2014.

                                                       BY THE COURT:

                                                       _____

                                                       Clark Waddoups
                                                       United States District Judge